**UNITED STATES of America, Plaintiff,**

v.

**Robert SCARETTA, Susanna Scaretta, and Vincent Graff, Defendants.**

**No. CR–93–0534 (S–2)(ADS).**

United States District Court, E.D. New York.

Jan. 18, 1996.

Zachary W. Carter, United States Attorney, by Peter Tomao, Assistant U.S. Attorney, Brooklyn, New York for U.S.

Francis X. Casale, Jr., Melville, New York, for Defendant Robert Scaretta.

Joseph P. Famighetti, Mineola, New York, for Defendant Susanna Scaretta.

Raymond M. Jermyn, St. James, New York, for Defendant Vincent Graff.

SPATT, District Judge.

This opinion follows a *Fatico* evidentiary hearing, held before the Court on December 15, 1995, December 28, 1995, December 29, 1995, January 2, 1996 and January 3, 1996. On December 28, 1995, by reason of a problem between the defendant Vincent Graff and

his counsel, the Court severed Graff's sentencing proceeding and continued with the *Fatico* hearing as against the defendants Robert Scaretta and Susanna Scaretta.

On November 21, 1994, following a jury trial, the Scarettas were convicted of, among other crimes, conspiracy to commit bank fraud and substantive counts of bank fraud. The charges arose from the Scarettas' operation of Revere Armored, Inc., an armored car delivery company, which was involved in various other financial operations for its bank and other customers, having its main facility in Bohemia, New York.

The presentence report prepared by the Probation Department on July 7, 1995, at paragraphs 29 and 47 calculated the loss, attributed to these defendants, at the sum of approximately 35 million dollars. Applying this loss to guideline 2F1.1(b)(1)(Q), (more than 20 million dollars and less than 40 million dollars), this resulted in a 16 offense level increase. The defendants disputed the amount of the loss and requested this *Fatico* hearing.

### Discussion

■ The burden of proof in this *Fatico* hearing is on the Government to establish the facts required to support the base offense level, in this case the amount of the loss, by a preponderance of the evidence. *U.S. v. Shonubi*, 998 F.2d 84 (2d Cir.1993); *U.S. v. Carmona*, 873 F.2d 569 (2d Cir.1989); *U.S. v. Lee*, 818 F.2d 1052, 1057 (2d Cir.) *cert. den.*, 484 U.S. 956, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987).

### Findings

After a review of all the evidence taken at this *Fatico* hearing, and considering the relevant trial testimony, the Court makes the following findings:

Among the operations of the Revere Armored Inc. in February 1993 was the transportation of currency and coin; picking up moneys for bank customers; counting and processing moneys in Revere's money room; acting as a limited bank branch maintaining and storing an inventory of currency and coin for certain banks; and transporting money to the Federal Reserve Bank ("The Fed").

The Court finds that defendants Robert Scaretta and Susanna Scaretta were the sole owners of Revere and actively managed and supervised all of the activities of the company. The Court has already determined that both Robert Scaretta and Susanna Scaretta were organizers and leaders. As such, they had virtually unlimited access to the currency and coin stored at the Revere Bohemia facility.

The proof at the trial, accepted by the Court, is that there were constant shortages in the banks' funds at Revere; that virtually all the "proof sheets" submitted by Revere to the banks were false in that the sums actually held by Revere were less than the sums recorded in the proof sheets; that at the time of bank audits, when representatives of the banks would physically visit the Bohemia facility to personally count the banks funds, moneys from other banks were transferred into the vault or bin of the bank to be audited, so that the shortages would be hidden.

Further, there was proof elicited at the trial, which the Court accepts, that the Scarettas spent large sums of money gambling in Atlantic City, New Jersey, on a weekly basis. In fact, cooperating witnesses testified that $30,000 in bank funds were set aside for these gambling trips each week. In addition, weekly cash sums between $5,000 to $7,000 were paid to a contractor for work completed at the Revere facilities and in various Revere employees' houses. Moreover, large sums of bank funds financed Revere's substantial "off-the-books" cash payroll. Other sums were used for bribes, as demonstrated by the testimony of William "Joe" Butler, who received regular cash payments from Robert Scaretta while employed as a money room manager at NatWest.

The Court finds that the Government established these additional facts at the *Fatico* hearing:

After Revere's business terminated and closed on February 9, 1993, the FBI and the Suffolk County Police Department attempted to secure the Bohemia facility, which stored

large sums of money. Simultaneously with the criminal investigation, the Government commenced a civil forfeiture proceeding and obtained an order of seizure of the Bohemia facility. Confronted with the state of disarray of the Bohemia facility and the huge amounts of currency and coin scattered throughout the building and in vehicles; and realizing that hordes of representatives from the banks, customers and insurance companies surrounded the facility clamoring for their money, property and information, the Government, logically turned to the Federal Court for assistance and guidance. The immediate object of the FBI was to secure and count the money in the Bohemia facility. Apparently neither the FBI nor the Suffolk County Police Department could provide sufficient and continued surveillance in order to safeguard this fungible asset.

The Court stepped in and appointed as Special Master and Temporary Receiver Jeffrey Stark, a former State Supreme Court Justice, to do the following: 1) safeguard the moneys, 2) count and store the moneys, 3) determine the identifiable cash and property and return it to the proper owners, and 4) determine ownership of the unidentifiable funds and set up a procedure to attempt to reimburse the proper owners.

To facilitate these objects, the Court authorized the Special Master to retain the firm of Brinks, Inc., an acknowledged leader in the armored car field. Brinks was assigned the task of entering the Bohemia facility in the presence of other designated persons, counting the moneys, transporting the moneys to the Brinks Kent Avenue facility, securing the funds pending the determinations of Special Master Stark and the Court, and depositing the moneys in the Federal Reserve account of the U.S. Marshal's Service.

The Court finds that the FBI was not directly involved in the counting, transportation and storing of the funds. The FBI supervised the area, and took possession of certain records. All of the money at the Bohemia facility was removed by Brinks under the supervision of the Special Master and the Revere insurance company agents, under the overall direction of the Court.

Special Master Stark arrived at the Revere Bohemia facility on February 12, 1993 with the immediate purpose to secure the Revere assets, count the moneys, and move them to a safe storage place as soon as possible. He successfully accomplished all of these missions in a timely manner. Under the continuing scrutiny of the FBI, and the Revere insurance company representatives, the money was counted in the Revere facility. The proceedings at Revere were photographed and videotaped by Court direction and all the currency and coin were moved out to the secure Brink facility within three days. It was a massive undertaking requiring a number of trips by many vehicles, moving approximately 25,000 packages, and 235 skids of coin. It took 35 to 45 men to load one trailer. The moneys at Revere were later determined to amount to 65 million dollars in currency and coin.

The Court finds there was no evidence of negligence, incompetence or wrongdoing on the part of the Brinks employees. The evidence indicates that the counting, transportation and storing of the funds by Brinks was done in a proper manner.

The Court further finds that Louis D. Magnan, a C.P.A. and a partner in the accounting firm of Campos & Stratis ("Campos"), was the representative of the Revere insurance companies, William H. McGee and Lloyds of London. The Campos agents led by Magnan were the watchdogs of the operation. It is clear that the Revere insurance carriers, who may have to ultimately pay for the missing funds, were anxious to see that all the moneys at Bohemia were accounted for. It was in the insurance companies' interest to account for all of the moneys on hand at the Bohemia facility. The smaller the loss, the less exposure by the Campos insurance company clients. It is clear and obvious that the Campos agents were present to make sure that all moneys were counted and secured.

On February 13, 1993, and over a weekend, four or five teams counted the money. Each team consisted of a Brinks representative and a Campos representative. All of this counting and transportation was photographed and filmed. The money was then

transported to Brinks in numerous armored trucks and trailers.

### Calculation of the Loss

After the money arrived at Brinks, an immediate fine count was made by teams consisting of Brinks and Campos representatives. The bulk and packaged money was sent to the Federal Reserve Bank where it was fine counted. The loose currency and coin was counted by Brinks. On April 30, 1993, the final count was determined, as follows:

| | |
|---|---|
| Currency and Packages (Consisting of 1,934 items, including 1300 sealed packages), rounded | $57,375,000.00 |
| Coin | 7,736,000.00 |
| TOTAL: | $65,112,288.00 |

The final figure, including currency used as evidence in the criminal trial by the Government; was the sum of $65,213,459.00. The Court finds that, physically in the Bohemia facility when it was taken over by law enforcement authorities on February 10, 1993, was the sum of $65,213,459.00.

The moneys were then deposited in the Federal Reserve Bank in the account of the U.S. Marshal's Fund, at interest. The Court was advised that the accrued interest is presently in excess of one million dollars.

Under the claim procedure instituted by the Court, identified property would be turned over to the customer, after exhibiting the proper papers including a receipt, and a claim form and affidavit were executed. As to the unidentifiable property, hearings were held by the Special Master to allow the claimants to attempt to identify their money. All of this was with the consent and in the presence of Campos representatives and on notice to Revere's attorney, David Sutton, Esq. Findings were made by Special Master Stark as to each claimant. These findings were approved by this Court.

Thereafter, a global settlement was agreed upon with each non-bank customer receiving 82½ cents on the dollar. Several claimants decided to appeal and funds are set aside for them. If the 4 million dollars in disputed

claims are reinstated by the Second Circuit, the loss in this case will increase by the said sum of 4 million dollars. The bank customers are to share the remaining moneys in the Marshal's fund. As a result, of the $65,213,-459 in currency and coin found at the Bohemia facility, the following moneys were paid:

| | |
|---|---|
| Preclaim identifiable deliveries to Banks | $ 7,006,399.00 |
| Preclaim identifiable deliveries to customers (approximate) | $10,475,836.00 |
| Release of other identifiable property from the Marshal's Fund | $ 265,671.00 |
| Paid to non-bank customers as per settlement agreement (82½ cents on the dollar) | $ 4,264,946.00 |
| Total paid to all claimants and customers to date | $22,012,852.00 |

Subtracting the money paid out for identified packages to banks and customers, and to non-bank customers as per the settlement agreement, namely, the sum of $22,012,852.00 from the total amount of the moneys found, namely, the sum of $65,213,459.00, there is now available to pay the bank customers the net sum of $43,200,606.00. This leaves unpaid only the bank customers.

The Court finds that Special Master Stark properly determined the amount of the loss of each bank customer, namely, the amount of money Revere held for each bank customer, as of February 9, 1993. This evidence, the amount of money of each bank customer held and possessed by Revere on February 9, 1993, is the final crucial element in the determination of the "loss" within the sentencing guidelines, which is the subject of this *Fatico* hearing. The amount of money each bank had delivered to Revere, and was in its possession on February 9, 1993 was determined by Campos by reviewing all the banks' records including their deposit slips, general ledger entries and Federal Reserve deposit slips and statements. In addition, each bank's claim was confirmed by an independent certified public accountant. The

Special Master's testimony as to the determination of the loss by each bank customer and his final determination as to the amount of the loss is as follows:

"Q  Which left an amount available to pay the banks and administrative expense and recoveries after appeal of $43,200,606; is that correct?

A  That's correct.

Q  And when you said 'recoveries after appeal,' that's what you described earlier?

A  That's right.  There were objections to Judge Spatt's orders approving my findings.  I think there (sic) about $4,000,000 worth of objections, so when the settlement was reached between the banks and the nonbank customers it was agreed to set aside that money pending appeals.  If any of the appeals are successful, that money would be used to pay those customers.  If the appeals are not successful, that money will be available to pay the banks.

Q  No matter what happens there will not be enough money it (sic) pay all the banks' claims?

A  That's correct.

Q  Did you determine the loss incurred by each bank?

A  I did.

Q  And you show that on Exhibit 2; is that correct?

A  Yes.

Q  And would you describe for the Court the process that was used to determine the loss for each of the banks?

A  Yes, these are simply the numbers taken from my files for each bank.  These are the numbers found by me and approved by Judge Spatt as the provable claim of each of the banks.  It's not necessarily the same as the claim the banks made.  Some banks weren't successful entirely and some bank have appeals pending.

Q  So then you say 'approve bank claims,' you meant that you approved these claims as being supported by the record?

A  No, Judge Spatt approved them on the basis of my findings.

Q  And the findings and the records that you have are available to the defendants in this case, to the defense attorneys; is that not correct?

A  Yes.  In fact, they've asked me to bring them in today and I have my own boxes to worry about.

Q  And have they gone to your offices to review those records on occasions?

A  They have.

Q  Would you tell us, what was the approved bank claim for Citibank?

A  $22,623,152.

Q  Would you tell us what the total approved bank claims were for Fleet Bank?

A  $1,196,741.

Q  Tell us what was the approved bank claim for Key Bank?

A  $10,263,426.

Q  And what was the total approved bank claim for Marine Midland Bank?

A  $32,562,984.

Q  What was the total approved bank claim for NatWest?

A  $4,832,929.

Q  And what was the total approved bank claim for the North Fork Bank?

A  $7,602,868.

Q  Did you total up those numbers?

A  I did.

Q  What was the total approved bank claims for those six banks?

A  $79,082,100.

Q  And putting aside the costs of administration and assuming all the appeals are denied, what is the total amount of money which is available to pay those claims?

A  $35,800,000—

Q  I'm sorry, the total amount available to pay the claims?

A  $43,200,606.

Q  *So what would be the minimum bank loss based upon your analysis?*

A  *$35,881,494.*

Let me just say there are no interest charges or credits in these numbers.

Q  So you haven't included any interest that was earned on the marshals (sic) account?

A   That's correct. And I haven't included any interest that the banks might claim they were entitled to by reason of their loss." (*Fatico* Hearing transcript pp. 121–124) (emphasis supplied).

### The Defendants' Contentions

█ The thrust of the defendants' case in this *Fatico* Hearing, as it was in the criminal trial, is that the Revere records would reveal what moneys *"were supposed to be"* at the Revere Bohemia facility. Since the records were partly destroyed, partly removed by Brinks, and partly suppressed by the Government, the defendants were prevented from determining what moneys *"were supposed to be"* at the Bohemia facility. The defendants base this argument on a number of circumstances. First, they complain that certain Revere records were destroyed by the landlord at the Beacon Falls, Connecticut facility. Second, the defendants contend that Brinks removed certain other Revere records when they transported the money in February 1993. Third, in a general, diffuse manner, the defendants complain that the Government, and the FBI in particular, discarded records, suppressed records and negligently failed to discover records. Fourth, the defendants hint that other entities may have illegally recovered moneys from Revere. These entities include Brinks and NatWest. As to Brinks, the defendants assert that Brinks was a competitor of Revere and wanted to remove them from the picture. The defendants also point to certain illegal activities by NatWest Bank in May 1992, asserting that NatWest discovered the Revere defalcations and removed 6 million dollars of NatWest moneys, knowing that the money was coming from funds of other banks. In addition, the defendants contend that the moneys on Revere trucks were not accounted for. All of this, according to the defendants, prevented them from showing that all of the bank's money and the customers' money was, in fact, physically in the Revere facility at the time of the shutdown on February 9, 1993. Finally, the defendants contend that, whatever the loss, it should not all be attributed to the defendants Robert Scaretta and Susanna Scaretta. The Court disagrees and rejects all of these arguments.

While the discovery of all the Revere records would be helpful in trying to ascertain the amount of the loss, it was not required for the purpose of this proceeding. First of all, there is no clear picture of what the Revere records were on February 9, 1993. The Court finds that the Bohemia facility was in a state of complete disarray, with money and records all over the place. Money and records were found in all kinds of unlikely places. Currency was found in clothes closets. Second, even if the proof showed *what* records Revere in fact created and maintained, the disorder prevalent following the shutdown, renders it difficult, if not impossible, to accurately determine the "loss" within the guidelines by means of the Revere records.

Third, the record keeping by Revere is extremely suspect, to say the least, since the Court finds that there was co-mingling of the many banks' funds; misappropriation of funds from all the banks; the daily issuance of false proof sheets to the banks; the improper removal of large sums of cash; and the general haphazard treatment of both the funds and the records by the Scarettas. Toward the end, they were apparently operating under panic conditions, desperately trying to move money around to meet bank audits and avoid detection. Special Master Stark testified that, in his opinion, his determinations of the claims and the losses, did not require the use of the Revere records.

Further, the Court credits the testimony of Louis Magnan, the Campos CPA, whose employees examined 40,000 to 50,000 bank source documents, when he stated that the Revere records would be helpful but not indispensable to the computation of the actual loss; that the Revere records were incomplete and, as such, could serve no purpose for evaluation; and that the bank records were satisfactory to him, representing the insurance companies who may have to pay these unpaid claims. As to the cash on hand and his accounting of the claims, Magnan testified that his figures were accurate and had no tolerance level as he gave exact numbers. Again, Magnan was brought in by the insurance companies who may have to pay the

losses, to evaluate the claims and it was in the best interest of his insurance company clients to see that all the money was accounted for and the claims were as low as possible.

The Court further finds that neither the Government nor the FBI intentionally suppressed or destroyed any Revere records. The FBI was presented with an extremely difficult situation when they arrived at the Revere facility immediately following the shutdown. The Suffolk County Police Department declined to assume responsibility for securing the huge amount of currency and coin stacked all over the Bohemia facility. The FBI obviously did not have the resources to handle this immense undertaking. They did the next best thing—the Government went to court and obtained court-authorized assistance. In fact, according to Special Master Stark, he and not the FBI had complete control over the money and the records relating to the money, pursuant to my orders. Under these crisis circumstances, the Government's actions were reasonable, logical and correct.

That some of the records were dispersed or destroyed, or removed and held by Brinks did not prevent the Government from proving the amount of the loss caused by the criminal conduct of the Scarettas. There was an alternative method of proving the loss; perhaps the more accurate mode. The Government had an independent, reliable and nationally-known armored car company secure, count, transport and deposit all the currency and coin on hand at the Bohemia facility. That huge and critical task accomplished, the Special Master then systematically determined the amount of the claims by persons who delivered money to Brinks. Due process considerations were faithfully followed by the Special Master. Revere, by its attorney, David Sutton, was present at the court proceedings and was given notice of and an opportunity to be heard at every round. Deducting the amount of the adjudicated claims from the actual count of the money on hand, resulted in an accurate result, as to the actual loss; in this case, approximately 35 million dollars.

In addition, the Court has provided the defendants with a full and fair opportunity to examine *all* of the available records, including the records removed to Brinks. During the course of the criminal and civil proceedings the Court directed complete and total discovery of all Revere records. All applications made by the defendants to examine records were granted. In sum, the attorneys for the defendants have had an opportunity to examine *all* the available records. Now that the defendants have recovered all of these records, including the black and blue notebooks held by Brinks, what did they show? Nothing that in any way discloses that there was not 65 million dollars on hand at Bohemia while there should have been more than 100 million dollars in customers' money. The Court finds that this massive and extended discovery, at all stages of the criminal proceeding, has resulted in no measurable proof as to the amount of the actual loss. This so-called "paper trail," or perhaps the lack of it, has resulted only in affording the defendants their main defense to both the criminal charges and the issue of the amount of loss in this *Fatico* hearing. The Court finds that the "paper trail" or lack of, does not, in any way, diminish the clear and convincing proof of the amount of the actual loss, as determined by the physical count and the valid claims.

Further, the Court finds that the claim of illegality or even criminal conduct on the part of the NatWest Bank, in May 1992, has no bearing on the question of the actual loss at Bohemia as of February 9, 1993. That NatWest Bank may have improperly, in their own interest, failed to inform law enforcement authorities of their knowledge as to the Scarettas' defalcations, does not in any way affect the actual physical count on February 12, 1993, and the adjudication of the bank claims as of February 9, 1993. That such a situation involving NatWest may require further court action in the future is irrelevant to the issue now before the Court.

In addition, the Court finds no evidence that the competitive factor induced Brinks to act improperly, in any manner. On the contrary, the Court finds that Brinks acted in an expeditious, diligent and efficient manner. Called upon to act under emergency circumstances, Brinks reacted with a massive output of personnel and trucks working virtually

around the clock. Its prior business relationship with NatWest and its prior delivery of coin to Brinks did not, in any way, affect the computation of the actual loss in this case. The Government proved that Brinks acted properly and well in all of its actions in this complicated and difficult situation.

Finally, there is no evidence that the moneys in the Revere trucks on February 9, 1993 were not either delivered to the customers or returned to Revere. In either event, such moneys are accounted for in the determination of the actual loss—either to increase the currency at Bohemia or to decrease the customers' claims.

■ As to the defendants' assertion that not all of the loss should be attributed to these two defendants, the Court disagrees. The proof at the trial reveals that these two defendants were the sole owners and operators of Revere. While no stock certificates were produced, the Court heard testimony as to who were the "bosses"; and the "bosses" were Robert Scaretta and Susanna Scaretta. The evidence revealed that the Scarettas were totally in control of Revere; they totally managed Revere; and they totally profited from the Revere operations.

All witnesses testified that the Scarettas managed and controlled the company. If they didn't use the words "owned" their testimony provided strong circumstantial evidence which led me to conclude that the Scarettas owned the company. There was no evidence that anyone else was involved at all, in the control or the ownership of this company. There's no evidence that anyone else profited, except by the cash payments that they received from the Scarettas by way of an "off-the-books" payroll and other types of inducements to continue to steal from one bank fund to cover shortages in another, like the $50,000 given to the employees as a "thank you" for doing a particularly good job of covering up a bank shortage.

All of this evidence leads to the reasonable and logical inference that these two defendants, Robert Scaretta and Susanna Scaretta, received the missing moneys or directly benefited from the missing moneys. The cash payments for payroll, to contractors, to bribe the bank officer; the substantial gambling losses running into hundreds of thousands and perhaps millions of dollars, is strong, if not overwhelming circumstantial evidence that these defendants were the sole beneficiaries of the missing funds.

■ That the amount of the loss was not litigated at the criminal trial is understandable since none of these crimes require that the amount of loss be established. The basic criminal fraud is a scheme to defraud. There need not be shown any actual loss. So that the amount of the loss was not an element of any of the crimes and need not have been proven by the government beyond a reasonable doubt at the trial.

The Court notes that in many other cases before the Court of fraud and theft, the estimated loss confirmed on appeal, was less accurate and precise than the actual loss computed in this case.

To summarize, the Court finds that there was found to be present in the Revere Bohemia facility immediately following the Revere closing, the sum of $65,213,459. Of this amount $22,012,852 was repaid to customers who either had identifiable packages with receipts or proved their entitlement to their money. This leaves the sum of $43,200,607 to be paid to the bank customers who have not yet been repaid. The Court finds that the six banks involved should have had the total sum of $79,082,100 at the Revere Bohemia facility when it closed on February 9, 1993. Since there is only the sum of $43,200,606 remaining to pay these claims, after repayment of all the other proper customer claims, the Court finds that the amount of the loss caused by the adjudicated criminal conduct of the defendants Robert Scaretta and Susanna Scaretta, for the purposes of this sentencing proceeding, to be the sum of approximately $35,000,000.

The presentence report calculated the loss at paragraphs 27, 28 and 47, as follows:

*"Loss Calculations*

27. After Revere's business terminated, the monies within the Bohemia facility were seized and eventually counted. The counting process was supervised by Special Master Jeffrey Stark. The participants included representatives from Brinks Armored Car Company and the Campos and Stratis accounting firm.

28. The counting process revealed that $65.1 million remained at Revere in both coin and currency. Some of those monies appeared to belong to particular customers and hence was characterized as 'identifiable.' For example, bags clearly marked with customers' names were labelled 'identifiable' and were returned to their rightful owners, who provided paperwork supporting their ownership. It is noted that early in this process, approximately $6.3 million was paid to banks while $13.7 million was paid to various commercial customers resulting in a balance of approximately $45 million (interest of about $1 million has been earned in the U.S. Marshals escrow fund.) However, most of the money recovered could not be specifically traced to an owner. Although $65.1 million was recovered, approximately $91 million in claims were filed. A complex series of hearings before Special Master Stark were convened to evaluate and prioritize the claims of bank and non-bank customers (*e.g.* Pergament, Gaseteria, etc.).

29. Of this $46 million (which includes the $1 million in interest earned in the aforementioned U.S. Marshals escrow fund), approximately $5 million will be used to pay all allowed non-bank general claims (i.e. $5,169,655.96) resulting in a balance in the Marshals Escrow fund of about $40 million. After payout of the $40 million against the allowed bank claims (i.e. $75,-108,940.42), approximately $35 million remains to be paid by the defendants, as noted below, in this case, and represents the loss in this offense. Government authorities inform that they will substantiate this amount as loss, at a Fatico Hearing, if necessary.

. . . .

47. Specific Offense Characteristics: The offense involved a loss of $35,000,000 attributable to the defendant. Per Guideline 2F1.1(b)(1)(Q), the offense level is increased by 16 since the loss exceeded $20,-000,000."

The Court finds that the Government proved, by a preponderance of the evidence, that the loss calculation set forth on the presentence report, namely, the sum of approximately 35 million dollars, is correct.

*Conclusion*

■ On the totality of the testimony and evidence at the *Fatico* Hearing and at the trial, the Court finds that the Government established, by a preponderance of the evidence, that:

1. The amount of the actual loss caused by the adjudicated criminal conduct of the defendants Robert Scaretta and Susanna Scaretta, is the sum of approximately 35 million dollars.

2. That the calculated loss attributed to the defendants, set forth in paragraphs 29 and 47 of the presentence report, in the sum of 35 million dollars, is correct.

3. That the 16 level increase, pursuant to Section 2F1.1(b)(1)(Q), as set forth in paragraph 47 of the presentence report is correct. Accordingly, the Court denies the application of the defendants Robert Scaretta and Susanna Scaretta to reduce the total offense level based on the actual loss.

**SO ORDERED.**